Elzaburu, Apelado, v. Chaves et al., Apelantes.

Apelación procedente de la Corte de Distrito de San Juan, Sección 1ª.

No. 799.—Resuelto en marzo 4, 1913.

Opinión del Tribunal Sentenciador—Récord.—Aun cuando la opinión del tribunal sentenciador no forma necesariamente parte del récord, es buena práctica el incluirla en el mismo para mayor ilustración del Tribunal Supremo.

Acción Reivindicatoria—Título.—Para poder ejercitar con éxito la acción reivindicatoria, es necesario que el. demandante alegue y pruebe un verdadero título sobre la .finca reclamada, superior al que pueda tener el demandado.

Id.—Pruebas.—Examinadas las pruebas practicadas en este caso, se llegó a la conclusión de que el demandante no demostró que fuera el único y legítimo dueño de la parcela reclamada, con derecho a reivindicarla del poder y posesión de los demandados.

Los hechos están expresados en la opinión.

Abogado de los apelantes: Sr. Manuel F. Rossy.

Abogado del apelado: Sr. Jacinto Texidor.

El Juez Asociado Sr. del Toro, emitió la opinión del tribunal.

En el presente caso se encuentran envueltas la propiedad de cierta parcela de terreno y la nulidad de un expediente posesorio y de su inscripción en el registro.

El demandante alega que la parcela reclamada es parte de una finca que le vendiera el Estado español y que el expediente tramitado por la causante de los demandados para acreditar la posesión de la misma, es falso y debe anularse. Y los demandados niegan el derecho del demandante y a su vez sostienen que ellos son los legítimos dueños de las tierras en disputa por haberlas adquirido desde 1875 por compra a Santos Caneti, haber acreditado luego su posesión y haber inscrito dicha posesión a su favor en el registro el año de 1896.

Examinadas las alegaciones y las pruebas, la Corte de Distrito de San Juan, Sección 1ª., dictó sentencia, en 24 de

marzo de 1911, resolviendo el caso en favor del demandante. En la sentencia se consigna que se dicta de acuerdo con la opinión emitida al efecto. Esto no obstante, dicha opinión no ha sido elevada a esta Corte Suprema. Ya hemos dicho en otra ocasión que, aun cuando la opinión no forma necesariamente parte del récord, es buena práctica el incluirla en el mismo para mayor ilustración del Tribunal Supremo.

Ejercitándose como se ejercita en este pleito la acción reivindicatoria, incumbe al demandante probar en primer término que es el dueño legítimo de las tierras reclamadas, poseídas en la actualidad por las demandados.

El Estado español inscribió a su favor el 14 de septiembre de 1895 la posesión, sin perjuicio de tercero que pudiera tener mejor derecho a la propiedad de la siguiente finca rústica:

"Predio de terreno, en el sitio de Honduras, barrio de Sabana Llana, término de Río Piedras, P. R., compuesto de ciento doce cuerdas, o sean cuarenta y cuatro hectáreas, diez y siete áreas y diez y seis centiáreas; colindando por el Norte con terrenos de don Frutos Caloca y doña Juana Rivera, por el Sur los de Laura García, antes Atanasio Vargas, Julia Zayas, Prudencio de la Cruz y Sucesión de Luis Vázquez; por el Este con los de Ignacio Llompart, Valentín Rondón, Sucesión de Juan Hernáiz, Prudencio de la Cruz, y María de la O Andino; por el Oeste los de Atanasio o Anastasio Vargas, luego Laureano Rosario."

Dicha finca se vendió en pública subasta el 15 de octubre de 1897 en $600 pagaderos en diez plazos anuales, y fué adquirida por Juan Manuel Cuadrado; Cuadrado cedió sus derechos al demandante Pedro de Elzaburu el 16 de octubre de 1897; Elzaburu ingresó el mismo día en la Tesorería el importe del primer plazo, habiendo satisfecho luego el importe de los restantes, y el 17 de octubre de 1898 el Secretario del Despacho de Hacienda del Gobierno Insular de Puerto Rico, en nombre del Estado, otorgó ante notario público la escritura de venta, que fué debidamente inscrita en el registro de la propiedad, a favor de Elzaburu.

Pero al ir Elzaburu a tomar posesión material de la finca, la encontró ocupada por diferentes personas, entre ellas por Paula Chaves, causante de los demandados. Elzaburu entonces dirigió un escrito al Secretario de Hacienda, fechado el 5 de abril de 1899, en el cual expresaba que no le había sido posible al peticionario como tampoco lo fué a sus cedentes, tomar posesión de la finca por la oposición de varios que alegaban tener títulos posesorios, y en su consecuencia solicitaba que la Hacienda le diera posesión de la finca e hiciera desalojar a los intrusos.

A consecuencia de este escrito, el oficial de ramo informó al Jefe del *Bureau* de Rentas Internas sobre los antecedentes del caso y propuso que se comisionara al alcalde de Río Piedras para que se constituyera sobre el terreno y diera posesión al comprador. No consta de la certificación expedida al efecto, cuál fué la resolución adoptada por el Gobierno, ni cuál fuera el resultado que se obtuviera al ejecutarla. Pero parece que en efecto se dió la comisión al alcalde, según se desprende de la declaración de Elzaburu en el acto de la vista. El demandante manifestó que a principios de 1900 fué a la finca acompañado del alcalde de Río Piedras y otras personas a tomar posesión de la misma, con citación de los colindantes, que "estuvo en casa de las Chaves, que sabían que se había verificado la subasta y que el declarante era el adjudicatario, las cuales manifestaron su pena por salir de la finca y entregaron al declarante una certificación de su inscripción posesoria en el registro."

En esa misma declaración, Elzaburu parece que sostiene que estaba en posesión material de todo el terreno que le vendiera el Estado, pero tal hecho no se armoniza ni con el actual ejercicio por su parte de la acción reivindicatoria, ni con el pleito de desahucio que anteriormente entablara, ni con el resultado de la demás prueba que demuestra que Paula Chaves primero y en la actualidad sus herederos, han poseído y poseen en concepto de dueños las tierras reclamadas desde

hace muchos años, con su posesión inscrita en el registro de la propiedad desde el 11 de marzo de 1896.

Antes de entrar en la consideración de si el Estado español llegó a adquirir algún derecho de propiedad sobre las tierras en disputa y lo trasmitió a Elzaburu, nos referiremos a dos casos civiles en los cuales las mismas partes que ahora sostienen esta controversia, litigaron en relación con la misma finca a que nos hemos venido refiriendo.

Ambos fueron procedimientos especiales. El primero, un expediente para convertir su posesión en dominio, iniciado por los herederos de Paula Chaves, y en el cual se opuso Elzaburu a lo solicitado y se dictó resolución final desestimando las pretensiones de los promoventes. Y el segundo, un caso de desahucio instado por Elzaburu contra los mencionados herederos, fallado en contra del demandante por no ser el procedimiento apropiado para dirimir las cuestiones suscitadas en el mismo.

A virtud de lo expuesto, se concluye fácilmente que ninguna de dichas decisiones puede tener autoridad de cosa juzgada con respecto a este caso, que debe resolverse por el mérito de las alegaciones hechas y de las pruebas practicadas en el mismo.

Entremos ahora en la investigación del título del demandante. Todo el derecho que pueda tener el demandante al dominio de las tierras reclamadas, lo deriva del Estado español. Si el Estado no llegó a adquirir derecho alguno, es bien claro que ningún derecho pudo trasmitir al demandante. En tal virtud es necesario examinar si se ha probado o nó el derecho del Estado.

No consta exactamente la fecha, pero sí se desprende con toda claridad de las pruebas el hecho de que un señor llamado Alonso María Hernández, para garantir el fiel desempeño de su cargo de receptor de contribuciones de Caguas, constituyó fianza sobre finca rústica. Dicho receptor cometió, al parecer, un desfalco y el Gobierno inició el oportuno expediente para resacirse de la cantidad malversada.

Naturalmente el procedimiento debió seguirse contra la finca sobre la cual se constituyó la fianza. El dato más antiguo que hay en los autos con respecto a la acción del Estado en relación con la finca, está contenido en una certificación librada por el alcalde de Río Piedras en la que se consigna que en "un expediente tramitado sobre deslinde, mensura y tasación de la estancia perteneciente al Receptor de Caguas, Don Alonso María Hernández, existe la constancia de que dichos terrenos fueron embargados por la Administración Central el 25 de mayo de 1875 y depositados en Eusebio Chiclana." Los terrenos no se describen. Ni siquiera se dice en dónde están situados.

Después parece que allá, por el año de 1884, según se afirma en una certificación expedida por el Comisionado del Interior, "se hizo por orden de la Hacienda Pública, una mensura de la finca que fué de Don Alonso Hernández, en Sábana Llana, de Río Piedras en 1854." Nada más se hace constar con respecto a dicha mensura en la exposición del caso preparada por el apelante, no impugnada por el apelado y certificada por el juez sentenciador.

Luego, según se desprende del oficio del agrimensor Hernáiz, al que nos referiremos en el siguiente párrafo, se levantó, en 1885, un acta de deslinde por el alcalde de Río Piedras con el geómetra Viera, de la finca del receptor Hernández.

En el año 1886, el agrimensor Hernáiz dirigió un oficio al administrador Central de Contribuciones y Rentas, " manifestándole que en cumplimiento de la comunicación de dicho administrador, de 23 de febrero último, se trasladó a Río Piedras, en cuya alcaldía le facilitaron los antecedentes y noticias de la finca del receptor Hernández, entre los cuales está la copia de la escritura de los hermanos Otero hecha al señor Hernández en Cayey; y el acta de deslinde levantada el año pasado por el alcalde con el geómetra Viera, colindante de los terrenos que ocupa María Chaves, y los testigos Santana y Llompart. Que en la escritura no hay arrumbamientos ni distancias y sólo hay datos de las colindancias con los puntos

cardinales; por lo cual no es posible apreciar si al verificarse el año cincuenta y seis la venta a Hernández, existía el terreno indicado en la escritura; que en acta de deslinde, se encuentran los arrumbamientos y puntos que deben servir de linderos para la mensura, con los cuales están conformes los colindantes, menos María Chaves, que ocupa y utiliza el terreno incautado por la hacienda, el cual compró a la Sucesión Caneti y presenta recibo de haber abonado algunas cantidades. Que procedió a la mensura y deslinde del terreno comprendido en el acta de mensura de la que hizo un plano acotado, encerrando 34 cuerdas, 23 céntimos, o sea la cuarta parte del que aparece vendido al receptor Hernández. Para aquilatar la verdad, debe hacerse un reconocimiento general de los títulos de los colindantes.''

En el año de 1892, se llevó a efecto un nuevo deslinde por el oficial facultativo García Saenz. La memoria escrita por este funcionario, dice: ''Que hizo un estudio del expediente sobre desfalco iniciado en 1854, el cual le dió a conocer que la falta de datos acerca de los límites y situación del terreno fué la causa de resultar infructuosos los diferentes deslindes que se han intentado para que el Estado recuperara el terreno, como afecto a la responsabilidad del desfalco; que la incautación más bien intentada que llevada a cabo por la Alcaldía de Río Piedras, en nombre del Estado, sólo se hizo de unas cuarenta a cincuenta cuerdas, haciendo constar que nunca se había conocido a Hernández, como dueño de terrenos en aquel barrio; que los terrenos objeto de la incautación, pertenecieron a Don Juan Otero, que vivió allí hacia el año 1820, en cuya época al trasladar su residencia a Caguas, dejó como encargado a Juan Caneti, quien los poseyó hasta su muerte, y después su hijo los vendió a Clemente, esposo de Paula Chaves, que los poseía en el acto de la incautación; que ni de la referida acta de incautación, ni de la escritura de los Otero, de 5 de mayo, 1854, ni del plano del deslinde de marzo del 86, único que se conoce, (*sic*) de ejecutarse operaciones por más que se concretaron a 34 cuerdas, que son de las ocupadas

como suyas por Paula Chaves, se puede deducir dato claro para afirmar cuáles sean los verdaderos terrenos de Hernández; pues la escritura de los Otero, sólo fija como límites los terrenos de la Marquesa de León y de José de la Cruz sin determinar la región ni los puntos y ángulos que forman sus lados y sólo habla de la extensión superficial aproximada de 140 a 150 cuerdas; que procedió al deslinde de toda la zona en que deben radicar los terrenos para con vista del deslinde y de los títulos de los poseedores, venir en conocimiento del terreno que perteneció a Hernández; que para ello se citó a los poseedores y se dió principio a las operaciones con este resultado: Los ocupantes de las parcelas números 3, 5, 6, 9, 10, 11 y 12, que los son María Nieves, Paula Chaves, José Martínez, Francisca Guerra, Teodoro Guerra, Gregorio Chaves y Dionisia Cruz, no presentaron documento alguno legal; por lo cual dichas siete parcelas pueden considerarse como parte de las 112 cuerdas, 1921 varas cuadradas, pudiendo ordenarse de hecho su incautación y procederse a su venta.''

El propio año de 1892, el Intendente de Hacienda acordó que para apreciar la legalidad de los títulos que se presentaron al ingeniero de montes al deslindar la finca del receptor Hernández, debían entregar dichos dueños los títulos de posesión que tuvieran a fin de examinarlos. Así se desprende de una comunicación dirigida al alcalde de Río Piedras el 11 de agosto de 1892, a virtud de la cual el alcalde citó a los dueños habiendo comparecido Gregorio Chaves, quien manifestó que el recibo que tenía de haber adquirido su terreno se le había quemado el año atrasado.

No aparece que se tomara inmediatamente medida alguna por el Estado, pero sí resulta que tres años después, en 1895, el administrador Central de Contribuciones y Rentas de Puerto Rico, de orden del Intendente General de Hacienda dirigió una comunicación al alcalde de Río Piedras para que tomara posesión en nombre del Estado de la finca de 112 cuerdas que se ha descrito, y que el alcalde, en 5 de junio de 1895, tomó posesión de la finca y se incautó de ella en nombre del

Estado, según el acta que levantara. No constan los detalles de la toma de posesión.

De la certificación expedida por el registrador de la propiedad relativa a la primera inscripción de la finca de 112 cuerdas vendida luego a Elzaburu, se comprueba que dicha primera inscripción se verificó a favor del Estado español "quien expresó que era dueño de ella, por incautación o adjudicación que se le hizo en el expediente seguido a Don Alonso Hernández, como receptor de Caguas para cobrarle $7,776.62 que se le reclamaban, y cuya adjudicación se efectuó el 5 de julio de 1895." La inscripción fué de posesión y se verificó el 14 de septiembre de 1895.

Por todo lo que hemos expuesto, hemos visto cuántas dificultades se presentaron al Estado español para encontrar la llamada finca del receptor Hernández, y que desde el primer momento en que trató de ocuparla, encontró allí a los Chaves en posesión de tierras que alegaban haber adquirido a título de compra, no habiéndose nunca expedido contra ellos por autoridad competente ninguna orden terminante y legal de desalojo.

Y es que si bien la fianza se constituyó sobre una finca rústica por el receptor Hernández, es muy dudoso que Hernández hubiera sido en realidad de verdad el dueño de la finca a la cual parecía referirse. De aquí surgen todas las dificultades.

Como una prueba del derecho de Hernández sobre la finca que gravara para garantir su cargo, se presentó "copia de una escritura hecha en Cayey el 5 de mayo de 1854, ante el alcalde de dicho pueblo Don Sebastián Colón, compareciendo los hermanos Don José Saturnino, Doña Isidora, Doña María, Doña Fruta y Doña Daría del Otero, diciendo que por sí y prestando caución por sus hermanos Don Bonifacio y Don Demetrio del Otero, venden a Don Alonso María Hernández, una estancia sita en el barrio de Honduras, Río Piedras, colindantes con la señora Marquesa de León y José de la Cruz, de ciento cuarenta a ciento cincuenta cuerdas, cuyo número fijo

de cuerdas se expresará en la escritura que al efecto se otorgue, así como sus puntos y linderos cuando se mensure, en dos mil doscientos pesos al contado, que confiesan recibido. Firman dicha escritura los hermanos de Don José Saturnino, Doña Isidora, Doña María, Doña Daría y Doña Justa del Otero, y Don Sebastián Colón, antes Lucas Vázquez; y no aparecen las firmas de los testigos que dice la escritura llamarse Don Sebastián Porrata, Don Ramón Pacheco y Don Felipe Agüero.''

Y como un antecedente aun más antiguo, se presentó por el demandante copia expedida por el Archivero General de Protocolos del Distrito Notarial de San Juan, de cierto expediente, del cual aparece que allá por el año de 1836, José Concepción de Castro, como albacea testamentario de su madre Eugenia de la Cruz, dirigió un escrito al alcalde mayor de la Capital manifestando que su representada heredó de sus abuelos en unión de su hermano José, un terreno en Honduras, Río Piedras, el que vendió en 1819 a Doña Juana María de Otero, quien sin escritura lo ha utilizado como suyo desde entonces, y que habiendo muerto su madre, promovía justificación de que ella heredó esa finca y la vendió después a dicha señora Otero.

El expediente se tramitó con citación de los colindantes y del Síndico Procurador General, y en él declararon los testigos

1. *José de la Cruz,* hermano de Eugenia, quien manifestó que ambos heredaron una finca, que Eugenia disfrutó de su mitad por más de veinte años hasta que la vendió a Doña Juana María de Otero, en 1819, y ''que ha visto como colindante poseyendo la expresada finca a Don Juan Caneti desde hace algunos años, pero ignora bajo qué denominación o título la disfruta.''

2. *Juan José Gimenes,* dijo que ''conoció la finca como de los padres de Eugenia y José de la Cruz; que éstos la heredaron, pasando José su parte a Eugenia y vendiéndola luego Eugenia a la señora Otero; que nada puede expresar con respecto a la posesión de la finca por la señora Otero, porque ha

visto disponiendo de ella a Don Juan Caneti hace algunos años, pero sin saber bajo qué título o denominación la posee.''

3. *Juan Gregorio Feliz,* depone en igual forma que el anterior.

4. *Domingo de Castro,* manifestó que ''era cierto el particular de la venta a la señora, pero ignora si ésta ha poseído el expresado fundo sin contradicción alguna, porque hace muchos años que no trafica por Honduras''; y

5. *Facundo de Castro,* expresó que ''desde su edad de doce hasta veinte y cinco años, conoció la estancia de Honduras como de la propiedad de José de la Cruz, padre de Eugenia y de José, quienes la heredaron, vendiendo José su parte a Eugenia y ésta, según oyó decir, la vendió a la señora Otero, y desde esa época nada más ha sabido el declarante; que ha oído decir que la poseía Don Juan Caneti ignorando bajo qué título.''

Terminada la práctica de las pruebas, informó el Síndico que a su juicio debía aprobarse la información, pues la propiedad de la finca se había acreditado debidamente y el hecho de que los testigos dijeran que la finca estaba poseída por Caneti, no desvanecía la legitimidad del derecho que se trataba de acreditar, pues ''Doña Juana pudo habérsela arrendado o vendido a Caneti.''

No aparece que Caneti fuera citado ni oído. La información fué finalmente aprobada por el Juzgado de la Capital el 20 de mayo de 1836.

Es evidente a virtud de una comparación de las colindancias y de un estudio de todas las pruebas, que la finca poseída anteriormente por Paula Chaves y hoy por sus herederos los demandados, está comprendida dentro de los límites fijados por el Estado español a la finca vendida al demandante Elzaburu. En cuanto al extremo de la identificación, no hay duda alguna. Pero si existe duda, y en tal grado, en cuanto al extremo del dominio, que, a nuestro juicio, no es posible concluir que el demandante ha probado que es el único y legítimo dueño

de la parcela reclamada, con derecho a reivindicarla del poder y posesión de los demandados.

Si examinamos cuidadosamente el expediente de 1836, veremos que no se describe la finca; que los propios testigos presentados por el promovente no aclaran el hecho de la posesión por parte de la Sra. Otero, limitándose al de la venta, y refiriéndose, además, al de la posesión por parte de Juan Caneti, ·y que el mismo síndico al proponer la aprobación del expediente consigna ''que aunque los testigos dicen que ·esa finca la posee Don Juan Caneti, esto no desvanece la legitimidad que tuvo Doña Eugenia, y Doña ·Juana pudo habersela arrendado o vendido a Caneti.'' Se ve, pues, que hay algo obscuro con respecto a Juan Caneti. Si éste hubiera sido un mero arrendatario o encargado de la finca actuando en armonía con la verdadera dueña, no se 'hubieran referido a él en la forma en que lo hicieron los testigos al declarar y el síndico al emitir su dictamen. Parece que ya, desde aquella remota fecha, existían intereses ·encontrados sobre las tierras cuyo dominio se discute en este pleito.

Si de 1836 pasamos al 1854, encontraremos la escritura de venta que se dice otorgada por los hermanos Otero a favor de Hernández. Esta escritura, base en que descansa el derecho de Hernández y por consiguiente el del Estado español y el de el demandante Elzaburu, es de tal manera defectuosa, que no puede reconocérsele el carácter de un verdadero documento público, ya que faltan en ella las firmas de los testigos que se dice que intervinieron en la misma como tales. Además, no se ha establecido la exacta conexión que pueda existir entre Doña Juana María Otero, a favor de quien se acreditó la propiedad de la finca en 1836, y los hermanos Otero, vendedores en 1854, ni tampoco consta que los hermanos Demetrio y Bonifacio del Otero ratificaran alguna vez la escritura, ni que cumpliendo lo dispuesto en la misma se otorgara la otra a que se hace referencia fijando los puntos y linderos y el número exacto de cuerdas de la finca vendida.

Sólo teniendo una base tan deleznable como la que le pro-

porcionaba la escritura de 1854, se puede explicar que el Estado español, no obstante su poder y sus grandes facilidades, tardara veinte años en perseguir la finca a que parece referirse la escritura, y en resolverse finalmente a inscribir su *posesión* en el registro.

Cuando ocurre el desfalco y se trata de hacer efectiva la deuda en la finca que se había gravado por el colector para garantir el ejercicio de su cargo, surgen las dificultades. La finca no se encuentra. El embargo de 1875 no se sabe cómo se trabó, ni sobre qué número exacto de cuerdas, ni dónde estaban situadas éstas con toda seguridad. En 1885, diez años después del embargo, solo se encuentran 34 cuerdas de las 140 o 150 de que al parecer se componía la finca vendida por los Otero a Hernández: deslinde practicado por el geómetra Viera.

En 1886 se consigna en un documento oficial por el agrimensor Hernáiz que con el acta de deslinde de Viera estaban conformes los colindantes "menos María (?) Chaves, que ocupa y utiliza el terreno incautado por la Hacienda *el cual compró a la Sucesión Caneti y presenta recibos de haber abonado algunas cantidades.*"

En 1892 el oficial facultativo, García Saenz, califica de *infructuosos* los deslindes practicados y de *"más bien intentada que llevada a cabo"* la incautación por parte del municipio a nombre del Estado, y consigna, además, que al verificarse la dicha incautación se hizo constar *"que nunca se había conocido a Hernández como dueño de terrenos en aquel barrio."* Dicho oficial facultativo, no obstante los antecedentes que establece, termina informando que careciendo de títulos legales diferentes personas, entre ellas Paula Chaves, que poseían entre todos unas 112 cuerdas, "puede ordenarse de hecho su incautación y procederse a la venta."·

Y así se hizo en efecto tres años más tarde por la Administración, resolviendo ésta por sí misma que tenía derecho a la posesión de las 112 cuerdas, ordenando al alcalde de Río

Piedras que se incautara de ellas, inscribiendo su derecho en
el registro y trasmitiéndolo luego al demandante Elzaburu.

No constan, como hemos dicho, los detalles de la toma de
posesión por parte del alcalde a nombre de la Administración
de las 112 cuerdas de referencia, pero es lo cierto que si en
esas 112 cuerdas estaban comprendidas las 50 poseídas por
Paula Chaves, ésta permaneció en posesión de ellas y no sólo
permaneció en posesión, sino que obtuvo una certificación ex-
pedida por la misma alcaldía de Río Piedras de que las poseía
en concepto de dueña a los efectos del expediente posesorio
aprobado en el propio año de 1895 en que se alega que tuvo
lugar la toma de posesión.

Con respecto al demandante Elzaburu, debemos consignar
además que, según resulta de la declaración que prestara en el
juicio, tenía conocimiento de todos los detalles de este caso por
haber intervenido como empleado que fué de la Administra-
ción de contribuciones en el expediente administrativo a que
diera lugar hasta inscribir la finca en el registro.

Bajo tales circunstancias, no es posible concluir que el
demandante, que ha ejercitado en este caso la acción reivin-
dicatoria, ha demostrado que él y sólo él es el legítimo dueño
de las cincuenta cuerdas poseídas por los demandados.

Y este criterio se impone con más fuerza todavía después
de analizar la prueba de los demandados presentada para
apoyar su reconvención.

Esa prueba consistió en las declaraciones de testigos, al-
gunos de ellos de mucha edad, tendiendo todas estudiadas en
conjunto a establecer que el primitivo dueño de la parcela en
disputa fué Juan Caneti, que de éste pasó a Santos Caneti, su
hijo, quien la vendió a Ramón Clemente, marido de Paula
Chaves, quedando luego como dueña Paula y sus hijos habidos
con Clemente, siéndolo éstos en la actualidad. Y en documen-
tos demostrativos de que Paula Chaves y Cruz acreditó ''la
posesión de la finca desde 1875, en que la compró a Santos
Caneti,'' instruyendo al efecto el necesario expediente con
citación de los dueños de los predios colindantes y declaración

de testigos, que fué aprobado el 7 de noviembre de 1895 e inscrito en el registro de la propiedad el 11 de marzo de 1896; del pago de las contribuciones; de resoluciones judiciales dictadas sobre declaratoria de herederos; de la sentencia dictada en el pleito de desahucio a que hemos hecho referencia, etc.

Estudiada en su totalidad toda esa prueba, y en relación con la del mismo demandante, se concluye que el derecho de los demandados arranca por lo menos desde el año de 1875 en que su causante compró a Santos Caneti, hijo de aquel Juan Caneti à quien se refiere el expediente de 1836 y de quien el Síndico decía que podía haberla arrendado o *comprado* a la Sra. Otero. Los Caneti estuvieron siempre en posesión, no está claro si como legítimos dueños o no, pero es lo cierto que estuvieron en posesión desde antes de 1836 y los demandados están en posesión como dueños desde 1875, en 1895 la acreditaron judicialmente y en 1896 la inscribieron en el registro. Se dirá que su posesión fué interrumpida precisamente desde 1875 a virtud del embargo trabado por el Estado y después por los repetidos actos del propio Estado y del demandante, pero es lo cierto que jamás ni el primero con todo su poder, ni el segundo recurriendo a todos los medios legales, pudieron hacerlos desocupar la finca y que en este pleito, puesto a prueba el título del demandante, hemos llegado a la conclusión de que no es suficiente.

Por las razones expuestas, debe revocarse la sentencia apelada y declararse sin lugar la demanda presentada en este caso, sin especial condenación de costas.

*Revocada.*

Jueces concurrentes: Sres. Asociados MacLeary y Wolf.
Juez disidente: Sr. Presidente Hernández.

El Juez Asociado Sr. Aldrey no tomó parte en la resolución de este caso.

OPINIÓN DISIDENTE EMITIDA POR EL JUEZ PRESIDENTE SR. HERNÁNDEZ.

Por escritura pública otorgada en el pueblo de Cayey con fecha 5 de mayo de 1854, ante el alcalde Don Sebastián Colón, los hermanos Don José Saturnino, Doña Isidora, Doña María, Doña Fruta y Doña Daría del Otero, obrando por sí y prestando caución por sus hermanos Don Bonifacio y Don Demetrio del Otero, vendieron a Don Alonso María Hernández por 2,200 pesos al contado, una estancia sita en el barrio de Honduras de Río Piedras, de 140 a 150 cuerdas, colindantes con la Señora Marquesa de León y José de la Cruz, y en dicho documento se expresó que el número de cuerdas se fijaría en la escritura que al efecto se otorgara, y sus puntos y linderos, cuando se mensurara, habiendo firmado los comparecientes y no los testigos del otorgamiento llamados Don Sebastián Porrata, Don Ramón Pacheco y Don Felipe Agüero.

Sobre la estancia expresada constituyó posteriormente Don Alonso María Hernández fianza a favor del Estado español para garantir las responsabilidades del cargo de receptor de contribuciones y rentas de Caguas, y para exigirle esas responsabilidades se formó contra él un expediente administrativo. Después de vencidas varias dificultades para el deslinde y mensura de la finca en cuestión, se llevó a efecto un nuevo deslinde de ella en el año de 1892 por el oficial facultativo García Saenz, quién procedió a deslindar toda la zona en que debían radicar los terrenos, fijando en 112 cuerdas con 1,921 varas cuadradas el terreno de que podía incautarse la administración para proceder a su venta y cubrir las responsabilidades en que había incurrido Hernández.

El terreno en cuestión, con la extensión expresada, fué adjudicado al Estado español en 5 de julio de 1895 e inscrito a su favor en el registro de la propiedad en 14 de septiembre del mismo año. En 15 de octubre de 1897 fué adquirido en pública subasta por Juan Manuel Cuadrado, el cual cedió

sus derechos al demandante Pedro de Elzaburu en 16 de octubre del mismo año, habiéndose otorgado escritura de venta a favor de Elzaburu en 17 de octubre de 1898, cuyo documento fué inscrito en el registro de la propiedad a favor de Elzaburu.

Las dificultades que se presentaron a Elzaburu para tomar posesión de parte de dicho terreno o sea de una parcela de cincuenta cuerdas poseída por los demandados y que a favor de Paula Chaves, causante de los mismos, había sido inscrita en el registro de la propiedad en 21 de marzo de 1896, con posterioridad a la inscripción hecha a favor del Estado español, han dado lugar al presente pleito en el que ambas partes discuten la propiedad de la parcela de terreno.

Es evidente, como sostiene esta corte en su opinión, que la finca poseída anteriormente por Paula Chaves y hoy por sus herederos los demandados, está comprendida dentro de los límites fijados por el Estado español a la finca vendida al demandante Elzaburu y en nuestra opinión también debe llegarse a la conclusión de que Elzaburu es el único y legítimo dueño de la parcela reclamada.

Elzaburu deriva su derecho del Estado español, el Estado español de Don Alonso María Hernández, y éste de los hermanos Otero, a virtud de la escritura pública de 5 de mayo de 1854.

Dicha escritura es un verdadero documento público, pues aunque falten en ella las firmas de los testigos que intervinieron en su otorgamiento, la ley entonces vigente no exigía las firmas, sino la presencia de los testigos y esa presencia no ha sido puesta en tela de juicio. Ni vicia ese documento de nulidad, la circunstancia de que no aparezca habérse otorgado escritura posterior fijando los puntos y linderos de la finca, pues tal fijación puede hacerse en otra forma, como así se ha hecho mediante la práctica del correspondiente deslinde. Tampoco apareja nulidad la falta de ratificación de la escritura por los hermanos Demetrio y Bonifacio del Otero, pues sus hermanos los otorgantes prestaron caución por ellos,

lo cual significa que respondían de que los tales Bonifacio y Demetrio aceptaban la escritura, y los demandados no han alegado que Bonifacio y Demetrio se hayan opuesto en tiempo alguno a la venta.

Ciertamente, que en expediente instruído hacia el año 1823 y aprobado por el alcalde mayor de esta ciudad de San Juan, se justificó que Eugenia de la Cruz heredó de sus abuelos en unión de su hermano José del mismo apellido un terreno en Honduras, Río Piedras, cuyo terreno había vendido en 1819 a Doña Juana María de Otero, desprendiéndose también de dicho expediente que Juan Caneti entró en posesión de dicha finca y la usufructuaba ignorándose bajo qué denominación o título. En el expediente declara José de la Cruz que su hermana Eugenia disfrutó de la mitad de la finca por más de 20 años hasta que la vendió a Juana María de Otero, lo cual revela que José de la Cruz quedó en posesión de la otra mitad y así lo corrobora el hecho de llamarse colindante de esa misma finca.

También en la escritura de 5 de mayo de 1854 otorgada por los hermanos Otero a favor de Don Alonso María Hernández, se consigna que la estancia a que se refiere colinda con la Señora Marquesa de León y José de la Cruz, dato que puede llevarnos a la conclusión de que la finca que fué de la propiedad de los hermanos Eugenia y José de la Cruz, es la misma total o parcialmente, que la de la escritura de 5 de mayo de 1854.

No se ha justificado en el juicio bajo qué título entró Juan Caneti en la posesión de la finca vendida a Doña Juana María de Otero, pues testigos que declararon en el expediente de que se deja hecho mérito ignoran semejante particular y el síndico al opinar que debía aprobarse la información consignó que la propiedad de la finca se había acreditado debidamente, sin que el hecho de que los testigos dijeran que la finca estaba poseída por Caneti desvaneciera la legitimidad del derecho que se trataba de acreditar, pues Doña Juana pudo habérsela arrendado o vendido a Caneti.

El expediente se promovió para justificar que Eugenia de la Cruz en unión de su hermano José, heredó de sus abuelos la finca, habiendo vendido la Eugenia su parte en 1819 a Doña Juana María de Otero, la que sin escritura la había usufructuado desde entonces, y no para demostrar que Juan Caneti tuviera algún derecho en la finca; pero como de la información resultaba que Juan Caneti la estaba poseyendo aunque sin saberse por qué título, de ahí que el síndico opinara que la posesión de Caneti no perjudicaba la legitimidad del derecho de propiedad que se trataba de acreditar, pues la finca lo mismo podía estar poseída por Caneti en concepto de dueño que en concepto de arrendatario.

Y Caneti no adquirió legítimamente de Juana María de Otero sino que fué un intruso en la posesión de los terrenos que ésta adquirió de Eugenia de la Cruz, a juzgar por lo que dice el oficial facultativo García Saenz en su memoria escrita en el año de 1892, a saber, que los terrenos objeto de la incautación pertenecieron a Don Juan Otero quien vivía en el barrio de Honduras en el año de 1820 en cuya fecha, al trasladar su residencia a Caguas, dejó como encargado de ellos a Juan Caneti quien los poseyó hasta su muerte, vendiéndolos después su hijo a Clémente, esposo de Juana Chaves, el cual los poseía en el acto de la incautación.

Contra la escritura pública de 5 de mayo de 1854, de la que deriva su derecho el demandante, no han presentado los demandados título alguno de igual o mayor fuerza, pues falta prueba de que Caneti, de quien derivan sus derechos los demandados, adquiriera legítimamente de Doña Juana de Otero, siendo más factible que los hermanos Otero a que se refiere la mencionada escritura de 5 de mayo de 1854, adquirieran de Doña Juana de Otero por título hereditario la finca vendida a Hernández, de que se incautó luego el Tesorero de Puerto Rico.

De todos modos, el título de Hernández de que deriva Elzaburu su derecho de propiedad es válido, y debe sostenerse mientras los demandados no demuestren que es falso criminal o civilmente. Esa prueba no ha venido al juicio.

No sabemos bajo qué título y en qué condiciones adquirió Juan Caneti de Juana María de Otero. Tampoco sabemos que Santos Caneti fuera único heredero de Juan Caneti. Ni favorece a los demandados la prescripción como título adquisitivo de dominio. Finalmente, la inscripción de posesión de la finca de que se trata, a favor de El Pueblo de Puerto Rico, fué hecha en el registro con anterioridad a la inscripción de igual derecho posesorio hecha a favor de los demandados y esa sería razón bastante para que fuera nula la inscripción posterior.

Por las razones expuestas debe confirmarse la sentencia apelada, por la que se declara que la propiedad de la finca de que se trata corresponde al demandante, quien tiene derecho a reivindicarla, y que es nula la inscripción de la posesión de dicha finca hecha en el registro de la propiedad a favor de los demandados.